[871 NYS2d 28]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUWANNA WROTTEN, Appellant.

First Department, December 30, 2008

### APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Daniel A. Warshawsky* and *Jonathan Marvinny* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Peter D. Coddington* of counsel), for respondent.

### OPINION OF THE COURT

McGuire, J.

This appeal calls upon us to determine whether Supreme Court erred in allowing the complainant to give televised testimony in defendant's assault trial. Although we do not decide this appeal on federal constitutional grounds, a review of the law on the scope of a defendant's Sixth Amendment right to

confront the witnesses against him or her helps explain the state law ground on which we do decide the appeal. In our view the admission of the two-way, televised testimony is not only unauthorized by either the Legislature or the inherent powers of the Judiciary, it is clearly, albeit implicitly, prohibited by the relevant provisions of the Criminal Procedure Law.

Defendant, a home health aide, briefly cared for the complainant's wife in the couple's Bronx home until the wife moved to a nursing home. Approximately 2½ months after the wife moved to the nursing home, defendant, who maintained a relationship with the couple, went to the complainant's house. While both defendant and the complainant testified that defendant helped the complainant prepare snacks to bring to the wife, they offered dramatically different accounts of what happened at the house. The complainant testified that defendant assaulted him with a hammer and demanded (and took) money from him before fleeing the house. Defendant testified that the complainant grabbed her breasts and that, to get his hands off her, she "picked up something and hit him with it." Defendant denied demanding or taking money from the complainant.

Defendant was indicted for assault in the first degree and two counts of robbery in the first degree. Prior to her trial, Supreme Court (Barrett, J.) granted the People's motion to present the complainant's testimony by television if he was unable to travel to New York to the extent of ordering a hearing on the issue of whether there was a factual necessity to permit the complainant to give televised testimony. Following the hearing, Supreme Court (Silverman, J.) determined that the People had established by clear and convincing evidence that the complainant was unable to travel to New York without seriously endangering his health. For this reason, Supreme Court concluded that he was unavailable to testify and permitted the People to present his testimony by a live, two-way television conference.

The complainant, while physically in California, gave the televised testimony. The complainant could see the courtroom, including the Judge and defendant, although the extent to which the witness could see the courtroom participants is in dispute, and could hear the proceedings in the courtroom. Those in the courtroom could see and hear the complainant. Ultimately, the jury considered four counts: one count of assault in the first degree, one count of assault in the second degree, one count of robbery in the first degree and one count of robbery in the second degree. The jury acquitted defendant of assault and rob-

bery in the first degree but convicted her of assault in the second degree.[1] On her appeal from her conviction of assault in the second degree, defendant's principal contention is that Supreme Court erred in permitting the complainant to give televised testimony.

Even assuming that defendant otherwise had a full opportunity to cross-examine her accuser, it does not follow that her Sixth Amendment right of confrontation was not violated. The Confrontation Clause of the Sixth Amendment "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination" (*Coy v Iowa*, 487 US 1012, 1017 [1988]). The former right "guarantees the defendant a *face-to-face* meeting with witnesses appearing before the trier of fact" (*id*. at 1016 [emphasis added]), and, due to the undeniably "profound effect upon a witness of standing in the presence of the person the witness accuses" (*id*. at 1020), "serves much the same purpose" as the latter right in "ensur[ing] the integrity of the fact-finding process" (*id*. at 1019, 1020 [internal quotation marks omitted]).

More recently, in *Crawford v Washington* (541 US 36, 51 [2004]), the Supreme Court observed the following about testimonial statements admitted against an accused: "The constitutional text, like the history underlying the common-law right of confrontation, . . . reflects an especially acute concern with [this] specific type of out-of-court statement." The statements by defendant's accuser in this case unquestionably were testimonial and, at least in a physical sense, those statements were made out of court.

To be sure, the Supreme Court also has emphasized that it "ha[s] never held . . . that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial" (*Maryland v Craig*, 497 US 836, 844 [1990]), and that "in *Coy v. Iowa*, we expressly left for another day the question whether any exceptions exist to the irreducible literal meaning of the Clause: a right to meet face to face all those who appear and give evidence at trial" (*id*. [internal quotation marks, ellipsis, brackets and emphasis omitted]). In *Maryland v Craig*, the Court upheld the receipt into evidence, in accordance with the required findings and proce-

---

**1.** The jury was unable to reach a verdict on the count of robbery in the second degree and the court declared a mistrial on that count.

dures specified by the Maryland statute under constitutional challenge, of the testimony of a child witness, who was alleged to be the victim of child abuse, given by one-way closed circuit television even though the witness could not see the defendant from the room outside the courtroom in which she was questioned. The majority, whose opinion was delivered by Justice O'Connor, joined by Chief Justice Rehnquist and Justices White, Blackmun and Kennedy, held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured" (497 US at 850). The dissent, delivered by Justice Scalia, joined in by Justices Brennan, Marshall and Stevens, argued that the "categorical guarantee" (*id.* at 860) of a face-to-face confrontation could not be overcome by the policy judgments of the Maryland legislature relating to the commission and prosecution of child abuse crimes (*id.* at 861). Stressing the "explicit constitutional text" (*id.*), Justice Scalia would have found unconstitutional this public policy exception to the constitutional guarantee that " '[i]n *all* criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him' " (*id.* at 870, quoting US Const Sixth Amend).

Before *Maryland v Craig* was decided, the Court of Appeals upheld, against a facial challenge premised on the Sixth Amendment right of confrontation, the provisions of CPL article 65, a comprehensive legislative enactment "authoriz[ing], in limited circumstances, the use of live two-way closed-circuit television as a method of permitting certain child witnesses to give testimony in sex crime cases from a testimonial room . . . separate and apart from the courtroom" (*People v Cintron*, 75 NY2d 249, 253-254 [1990] [footnotes omitted]). That legislative scheme reflected the Legislature's considered policy decisions in an effort to balance important but competing concerns. As the Court stated, "Article 65 is designed to further the aim of insulating child witnesses from the trauma of testifying in open court and also, under certain conditions, from having to testify in the presence of the defendant while, at the same time, fully preserving the defendant's constitutional rights" (*id.* at 254).

After *Maryland v Craig* was decided, a panel of the Second Circuit rejected a defendant's contention that his constitutional right to confront the witnesses against him was violated by the admission at trial of the testimony of a government witness

who testified via two-way, closed circuit television from a remote location (*United States v Gigante*, 166 F3d 75, 79 [1999], *cert denied* 528 US 1114 [2000]). After an evidentiary hearing was held on the government's application, the District Court issued an order authorizing the closed-circuit presentation of the witness' testimony on the ground that the witness was too ill to travel to court. Significantly, the District Court issued the order despite the absence of any congressional enactment specifically authorizing the receipt of testimony at trial against a criminal defendant via closed-circuit, two-way television. Rather, as stated by the Second Circuit, the District Court Judge "bas[ed] his decision upon his inherent power under Fed.R.Crim.P. 2 and 57 (b) to structure a criminal trial in a just manner" (*id.* at 80 [internal quotation marks omitted]). Notably, the Second Circuit's decision does not discuss—presumably the issue was not raised—the question of whether the District Court had the inherent authority to permit the televised testimony.

Defendant argues, among other things, that this case is distinguishable from *Maryland v Craig* because securing the testimony of a witness who is unavailable to testify due to poor health is not a sufficiently important public policy concern to justify the attendant curtailment of a defendant's Sixth's Amendment right of confrontation. In this regard, defendant relies in particular on the en banc decision of the Eleventh Circuit in *United States v Yates* (438 F3d 1307 [2006]), in which the testimony of two witnesses who were unwilling to travel from Australia to the United States to testify was presented to the jury by live, two-way video teleconference (*id.* at 1309, 1315). The Eleventh Circuit accepted the District Court's conclusion that the witnesses were necessary to the prosecution's case (*id.* at 1316), but held that under the circumstances presented, "the prosecutor's need for the video conference testimony to make a case and to expeditiously resolve it are not the type of public policies that are important enough to outweigh the Defendants' rights to confront their accusers face-to-face" (*id.*).

Defendant also challenges the finding that the witness was unavailable to testify due to poor health, and stresses that the prosecution's expert, when asked whether the witness would survive a trip back to New York, responded "You know, I suppose he would." In addition, defendant offers two other fact-based reasons, both of which she raised in Supreme Court, to support her contention that the televised testimony violated her Sixth Amendment right of confrontation. First, defendant

maintains that the witness was unable to see clearly the participants in the courtroom in New York. Second, defendant objects, albeit not in the argument section of her main brief, that no New York court officer or any other New York judicial official was present in the room in California to supervise the proceedings and make sure that the witness was not improperly communicated with during the televised testimony.[2]

Finally, defendant also argues that, given changes in the composition of the United States Supreme Court since *Maryland v Craig* was decided, the Supreme Court as presently constituted likely would rule that her Sixth Amendment right of confrontation was violated.[3] Of course, however, a decision of the United States Supreme Court is binding on us unless and until it is overruled. An argument that the Supreme Court will or likely will overrule one of its decisions, whatever force the argument may have in a particular case, does not undermine the binding nature of the precedent; our office is not to predict the law, but to declare and apply it.

█ In any event, we need not decide any of defendant's specific contentions or reach the federal constitutional question pressed upon us by the parties. The Legislature has authorized trial courts to admit televised testimony only by child witnesses in certain sex crime cases and under carefully specified circumstances. In this crucial respect, *Maryland v Craig* and *People v Cintron* are distinguishable in that the abridgment, albeit not the violation, of the defendants' right to confront the witnesses against them in these cases was authorized by statutes reflecting critical public policy choices by the legislative branch.

If trial courts in New York have the inherent authority to admit the live, two-way, televised testimony of elderly or infirm witnesses who are unable to appear in court without endangering their lives, at least four confounding questions arise. (1) Was the enactment of CPL article 65 unnecessary in the sense that even without article 65 trial courts could have exercised that inherent authority and received the live, two-way, televised testimony of child witnesses in certain sex crime cases under circumstances identical or similar to those specified by the Legislature in article 65? (2) If the answer to the first question

---

**2.** The witness was not sworn to tell the truth by anyone in California but by the court clerk, who of course was in New York. The parties do not address the issue of whether he was validly sworn.

**3.** Defendant makes no mention in her main or reply brief of *People v Cintron*.

is yes, can that answer be reconciled with the fundamental precept of separation of powers committing critical public policy judgments exclusively to the legislative branch (*see Bourquin v Cuomo*, 85 NY2d 781, 784 [1995] ["(t)he constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (citations omitted)]), not to the judicial branch or the judicial branch acting at the behest of an executive branch official, i.e., the District Attorney? (3) If the answer to the first question is yes, could the Judiciary invoke its inherent authority and permit, for example, the receipt of live, two-way, televised testimony either from child witnesses who are 15 years old or less (despite the Legislature's determination to authorize such testimony only by child witnesses who are 14 years old or less [*see* CPL 65.00 (1)]) or in prosecutions under Penal Law article 263, entitled "Sexual Performance by a Child" (despite the Legislature's determination to limit the offenses to those defined in Penal Law article 130 and Penal Law §§ 255.25, 255.26 and 255.27 [*see* CPL 65.00 (1)])?[4] (4) Whatever the answer to the first question is, can the enactment of the carefully circumscribed authority conferred by article 65 be thought to authorize an expansion of that authority by the judicial branch or the judicial branch acting at the behest of the executive branch?

As is both evident from *Maryland v Craig* and *People v Cintron* and indisputable in any event, the enactments at issue in both cases reflected critical policy judgments by the legislative branch. For that reason, we doubt that the answer to the second question is yes. But that question need not be decided for this case turns on the answer to the first, third and fourth questions. In our view, the answer to these three questions is no, and that answer compels the conclusion that the trial court had no authority to permit the live, two-way, televised testimony admitted against defendant. If, as we think is self-evident, the Judiciary lacks the authority effectively to make piecemeal revi-

---

**4.** Pursuant to chapter 320, § 12 of the Laws of 2006, the Legislature expanded the class of offenses to include Penal Law §§ 255.26 and 255.27. Two years earlier, pursuant to chapter 362, § 2 of the Laws of 2004, the Legislature amended the provision of CPL 65.00 (1) defining the term "child witness" to mean a person 12 years old or less by redefining that term to mean a person 14 years old or less. Accordingly, another but not at all confounding question arises: were these legislative enactments amending article 65 unnecessary in the sense that they could have been effectuated by the Judiciary through an exercise of its inherent authority?

sions to CPL article 65 like those hypothesized in the third question, it is impossible to understand how the Judiciary could have the authority effectively to make the more sweeping revisions to CPL article 65 that actually would be made by sustaining the use of the televised testimony in this case. As discussed below, moreover, the conclusion that the televised testimony in this case is not authorized is supported by more than logic.

█ The question of the authority of the trial court to admit the televised testimony is preserved for our review. In an opinion dated March 22, 2004, Justice Steven L. Barrett, who did not preside over the trial, granted the People's application for a conditional examination of the witness pursuant to CPL 660.20. As Justice Barrett noted, however, "[s]uch an examination . . . contemplates the witness' presence in New York state." Thereafter, the People asserted that the witness was too ill to travel to New York and sought an order permitting the receipt of the witness' testimony at trial via a live, two-way televised procedure whereby the witness would remain in California. In opposing the People's motion, counsel argued both that the procedure would violate defendant's Sixth Amendment right to confront the witness and that "[t]he procedure . . . the [P]eople seek to conduct is not authorized in New York." In support of the latter argument, counsel expressly argued that New York courts "have recognized video testimony of a witness, in lieu of physical presence, only when authorized by statute." Justice Barrett rejected that argument and granted the People's motion in a written decision and order dated August 10, 2004. Justice Barrett relied on "the inherent power of a trial court to fashion procedures that will ensure the integrity of the trial process." He cited Judiciary Law § 2-b (3), which provides that "[a] court of record has power . . . to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it."[5] Accordingly, defendant's timely and specific protest that the procedure sought by the People was not authorized, as well as Justice Barrett's express ruling on that

---

**5.** Thereafter, counsel elaborated upon this argument at length in a memorandum of law submitted in support of defendant's motion to reargue the August 10, 2004 order. In a written decision and order dated September 3, 2004, Justice Barrett adhered to his prior decision. Although Justice Barrett discussed the Sixth Amendment issue at length, he saw no reason to allow reargument on the issue of the "inherent power [of courts] to employ procedures not expressly authorized by statute" as that issue was "squarely addressed at oral argument, in the memorandum filed, and in the initial decision of the Court."

protest that the inherent power of the courts was sufficient to authorize it, has preserved the issue for our review (CPL 470.05 [2]).[6]

■ Justice Barrett's and the dissent's reliance on Judiciary Law § 2-b (3) is misplaced. That statute limits the authority of a court to adopt "new process and forms of proceedings" to those that are "*necessary* to carry into effect the powers and jurisdiction possessed by it" (emphasis added). The word "necessary" is not so elastic as to include whatever a court considers convenient or desirable from a public policy perspective. That trial courts in criminal cases did without live two-way, televised testimony of *any* witnesses until CPL article 65 was enacted in 1985 (L 1985, ch 505) is proof enough that authorizing the televised testimony in this case is not "necessary to carry into effect the powers and jurisdiction" of trial courts.

For this reason alone Judiciary Law § 2-b (3) cannot plausibly be thought to authorize the televised testimony of witnesses in criminal trials under any circumstances, let alone circumstances broader than those specified in article 65. Moreover, there is another important reason why Judiciary Law § 2-b (3) does not authorize the televised testimony in this case. The authority it confers or recognizes is limited as well to "new process and forms of proceedings." The statute, in other words, is concerned with the authority of courts over matters of procedure. The inherent authority of courts over matters of procedure may well entail some incidental authority over matters of substance, and we recognize that a nice distinction between matters of procedure and substance cannot always be drawn.[7] But it scarcely follows that a coherent line can never be drawn. As discussed above (and below), any determination to permit the receipt of the live, two-way, televised testimony of a witness in criminal cases necessarily requires substantive policy decisions to be made, not decisions about matters that largely are procedural in nature. Indeed, what is true of the Legislature's decision to enact article 65 is equally true of the decision by the trial court in this case to permit the televised testimony of the witness. The Bill Jacket for the bill that enacted article 65 contains a letter

---

6. In light of this conclusion, we need not consider whether the admission of the televised testimony constitutes a mode of proceedings error that need not be preserved for appellate review (*see People v Agramonte*, 87 NY2d 765, 769-770 [1996]).

7. Similarly, the powers of each branch "cannot be neatly divided into isolated pockets" (*Bourquin v Cuomo*, 85 NY2d at 784).

from the Office of Court Administration (OCA) responding to a request from Governor Cuomo for its views on the bill. OCA's counsel stated that

> "[t]he Office of Court Administration takes no position with respect to the advisability of permitting a child's testimony to be taken by means of closed-circuit television, which is a matter of public policy to be determined by the Legislature" (July 1, 1985 letter from Michael Colodner, at 2, Bill Jacket, L 1985, ch 505).

If the inherent powers of the Judiciary are sufficient to authorize the televised testimony in this case, it must be that these powers represent a broad source of authority that would permit trial courts to expand the use of live, two-way, televised testimony in other circumstances not specified in article 65. The dissent stresses that "the record supports the hearing court's finding that it would be medically unsafe and potentially life-threatening for the victim, a man in his eighties afflicted with severe health problems and residing in a California assisted living facility, to travel to New York." But if the expanded use of televised testimony in this case is authorized by the inherent powers of the Judiciary, it necessarily follows that these powers would authorize its expansion, for example, to all cases in which it would be "medically unsafe and potentially life-threatening" for any witness, regardless of age or where the witness resides (be it New York or any other state), to travel to the particular court in New York in which the prosecution is pending. A policy judgment or a constitutional provision would or might prevent such an expansion, but the dissent does not and cannot identify any limiting principle in the inherent powers of the Judiciary that would prevent it.[8]

We recognize that the inherent powers of the Judiciary "are neither derived from nor dependent upon express statutory authority" (*Gabrelian v Gabrelian,* 108 AD2d 445, 448 [1985], *appeal dismissed* 66 NY2d 741 [1985]), and thus are of constitutional stature (*id.* at 448-449). But even assuming that

---

8. Indeed, the contended-for inherent powers of the Judiciary must be broader still. After all, it cannot be that the inherent power of the Judiciary to authorize the use of televised testimony of witnesses in criminal cases first sprang into existence when television became a reality in the middle of the twentieth century. Thus, it must be that the inherent powers of the Judiciary to authorize the use of televised testimony of witnesses in criminal cases is an instance of some broader authority that existed before the advent of television. Suffice it to say, the nature of that preexisting authority is not apparent.

Judiciary Law § 2-b (3) confers powers that are narrower than those arising from the constitutional stature of the courts, the analysis would not change (see id. at 449 [under the inherent powers doctrine a court "has the powers reasonably *required* to act as an efficient court" (internal quotation marks omitted; emphasis added)]).

The dissent suggests that we view Supreme Court's inherent powers, and its powers under Judiciary Law § 2-b (3), as being "limited to those absolutely indispensable to its functioning." We say nothing that reasonably can be construed as expounding any such view. To the contrary, our position is not that there is *no* elasticity in the word "necessary" (or in the word "required") but only that, to repeat ourselves, the word is not so elastic as to include whatever a court considers convenient or desirable from a public policy perspective.

It certainly would be presumptuous of us, to say the least, to construe the word "necessary" inconsistently with Chief Justice Marshall's famous opinion in *McCulloch v Maryland* (4 Wheat [17 US] 316 [1819]). Happily for us, we do not. As Chief Justice Marshall stressed, the word "necessary," "like others, is used in various senses; and, in its construction, the subject, the context, the intention of the person using them, are all to be taken into view" (*id.* at 415). Thus, in rejecting the argument that Congress' power under US Constitution, article I, § 8 (18) to pass laws "necessary and proper for carrying into Execution" the powers expressly granted to Congress is limited to those that "are indispensable, and without which the power would be nugatory" (*id.* at 413), Chief Justice Marshall relied in part on the terms of the second clause of article I, § 10, which prohibits the states, without the approval of Congress, from laying imposts or duties on imports or exports, "except what may be *absolutely* necessary for executing its inspection Laws" (emphasis added). As Chief Justice Marshall wrote, it is "impossible" not to "feel[ ] a conviction that the convention understood itself to change materially the meaning of the word 'necessary,' by prefixing the word 'absolutely' " (*id.* at 414-415).

More importantly, however, Chief Justice Marshall concluded that there was more than a dollop of elasticity in the word "necessary" for a more fundamental reason. To construe the word to confer only those powers that are "indispensably necessary" (*id.* at 418), "would abridge, and almost annihilate, this useful and necessary right of the legislature *to select its means.* That this could not be intended, is, we should think . . . too apparent

for controversy" (*id.* at 419). Similarly, our view is that the scope of the Judiciary's inherent powers must be appraised in the context of a constitution providing that "[t]he legislative power of this state shall be vested in the senate and assembly" (NY Const, art III, § 1). We also think it too apparent for controversy that the dissent nonetheless vests in the Judiciary sweeping powers that are legislative in nature because they entail the authority to make "critical policy decisions" (*Bourquin v Cuomo*, 85 NY2d at 784).

For the reasons discussed, the Judiciary's inherent powers under the dissent's view are laden with policy-making authority. But consider, too, the following: the only limiting principle on the authority to receive the televised testimony of an absent witness in a criminal case appears to be that the prosecution otherwise must not be able to go forward.[9] Presumably, the dissent does not believe that this inherent authority can be enlisted only in the ranks of the prosecution. That could not be reconciled with either the presumption of innocence or a defendant's constitutional right to present a defense (*see Chambers v Mississippi*, 410 US 284, 294 [1973]). Accordingly, it must be that the Judiciary's inherent powers also are so sweeping as to permit the televised testimony of an absent defense witness when the defendant otherwise would not be able to go forward with a defense.

The dissent does not attempt any answer to the first question posed above. Its position, however, entails the proposition that the Judiciary, even before the enactment of article 65, had inherent authority to permit the televised testimony of child witnesses in certain sex crime cases under circumstances identical or similar to those specified in article 65. Moreover, its position entails the additional proposition that the Judiciary, even before the enactment of article 65, had inherent authority to permit the televised testimony of witnesses in criminal cases under circumstances broader than those specified in article 65, including those presented by the facts of this case. Both propositions are inconsistent with "the constitutional principle of separation of powers . . . requir[ing] that the Legislature make the critical policy decisions" (*Bourquin v Cuomo*, 85 NY2d at 784); the dis-

---

**9.** In other words, the court's inherent authority to receive the testimony is at its zenith when the witness is most important to the prosecution and at its nadir when the witness is not important. Does the exercise of that authority also depend on judgments by trial courts about how important the crime charged is from a public policy perspective?

sent makes no attempt to reconcile the sweeping inherent powers it discovers in the Judiciary with that constitutional principle.

*People v Herring* (135 Misc 2d 487 [1987]) provides clear, albeit indirect, support for our position. In *Herring,* the court concluded that CPL 60.44, which expressly authorizes a court to permit a witness less than 16 years old to use an anatomically correct doll in testifying in prosecutions for certain sex crimes and other offenses, did not preclude the court from permitting the use of such a doll to facilitate the testimony of an elderly and aphasic witness in a sodomy prosecution (*id.* at 489-490). As the authorities cited by the court make clear (*id.* at 490), and as cannot be doubted in any event, trial courts always have had discretionary authority to allow the use of demonstrative evidence. Accordingly, the decision to permit the receipt into evidence and use of an anatomically correct doll is a mere instance of that existing authority. It no more required legislative authorization than did the decision of courts with the advent of color photography to permit the receipt into evidence and use of color rather than black and white photographs. Moreover, also unlike the decision to permit the use of the televised testimony of a witness in a criminal case, the decision to permit the use of this particular form of demonstrative evidence does not entail the exercise of any significant policy-making authority and does not affect, let alone curtail, a substantive constitutional right of the defendant.[10]

On this score, finally, we note that in *United States v Yates* (438 F3d 1307 [2006]) the Eleventh Circuit rejected the prosecution's argument that the admission of the two-way, televised testimony of the witnesses in Australia was a matter within the inherent powers of trial courts (*id.* at 1314). In this regard, the Eleventh Circuit held that "history demonstrates otherwise" (*id.*) and relied largely on the Supreme Court's deci-

---

**10.** For these same reasons, it would make no sense to construe CPL 60.44 to reflect a legislative determination to preclude the use of anatomically correct dolls in all circumstances other than those specified in the statute. Moreover, we note that the Bill Jacket for the bill that enacted CPL 60.44 contains two letters from legislators to Governor Cuomo. Both letters report that "some judges" had not allowed the use of such dolls (*see* July 18, 1986 letter from Senator Dean G. Skelos, at 1, Bill Jacket, L 1986, ch 358; July 14, 1986 letter from Assemblywoman May W. Newburger, at 1, Bill Jacket, L 1986, ch 358). By contrast, as discussed below, the only reasonable conclusion is that article 65 does reflect a legislative determination to preclude the use in criminal cases of televised testimony in all circumstances other than those specified in this comprehensive enactment.

sion not to transmit to Congress for its approval an amendment to Federal Rules of Criminal Procedure rule 26 proposed by the Advisory Committee on the Criminal Rules that would have conferred broad authority to allow testimony by means of two-way video conferencing (*id.*). The Eleventh Circuit pointed out that Justice Scalia had "filed a statement explaining that he shared 'the majority's view that the Judicial Conference's proposed Fed. Rule Crim. Proc. 26 (b) is of dubious validity under the Confrontation Clause of the Sixth Amendment' " (*id.* at 1314, quoting *Order of Supreme Ct.*, 207 FRD 89, 93 [2002]).[11] We reach the same result for the different reason that precisely because courts would be required to make judgments about the relative importance of various public policy concerns—judgments that are not the province of the Judiciary (*Bourquin v Cuomo*, 85 NY2d at 784)—their inherent powers do not authorize them to decide when to permit the use of the televised testimony of witnesses in criminal cases.

Even if there were a well of inherent judicial authority deep enough to authorize the use of the televised testimony of a witness in criminal cases, article 65 displaced its waters so as to preclude the exercise of that authority. The comprehensive legislative scheme enacted as CPL article 65 reflects a host of crucial policy judgments made by the Legislature. The Judiciary, as a co-equal branch, is bound to conclude that the policy judgments made by the Legislature were considered ones (*see Middlesex County Sewerage Authority v National Sea Clammers Assn.*, 453 US 1, 15 [1981] ["In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate"]; *Farrington v Pinckney*, 1 NY2d 74, 88 [1956] ["the choice of measures is for the legislature, who are presumed to have investigated the subject, and to have acted with reason, not from caprice" (internal quotation marks omitted)]). Obviously, in enacting article 65, the Legislature went only so far in authorizing the admission against criminal defendants of live, two-way, televised testimony of witnesses. Nothing in article 65 even hints that the Legislature intended to allow trial courts to admit such testimony under any circumstances other than those

---

11. Of course, the inherent powers of federal district courts are not necessarily as broad as those of New York courts and, in any event, we would not be required to come to the same conclusion as the Eleventh Circuit even if they were (*see People v Kin Kan*, 78 NY2d 54, 60 [1991]). Needless to say, however, we regard the Eleventh Circuit's decision as persuasive authority.

prescribed in article 65. If we conclude, as we must, that the decision to go only that far was a considered judgment by the Legislature, we should conclude as well that whatever the scope of the Judiciary's inherent powers otherwise might be, trial courts have no authority to permit the receipt of such testimony in circumstances that are not authorized by article 65. The contrary conclusion would permit another branch of government not only to exercise legislative powers but to trample on the policy choices made by the Legislature. And that, of course, would offend "[t]he constitutional principle of separation of powers, . . . [which] requires that the Legislature make the critical policy decisions" (*Bourquin v Cuomo*, 85 NY2d at 784).

Our conclusion that the Legislature intended in CPL article 65 to go only as far as it did in authorizing the receipt of live, two-way, televised testimony in criminal cases is buttressed by "the standard canon of construction of *expressio unius est exclusio alterius*" (*Morales v County of Nassau*, 94 NY2d 218, 224 [1999]). Thus, we can infer that the expression of authority to permit such testimony under specific circumstances indicates an exclusion of authority under other circumstances (*see id.*). Similarly, that conclusion is reinforced by the comprehensive nature of CPL article 65. In *Mark G. v Sabol* (93 NY2d 710 [1999]), the Court of Appeals rejected the claim that a private cause of action should be recognized under title 4 of article 6 of the Social Services Law. In explaining its conclusion that *recognizing such a cause of action* "would not be consistent with the legislative scheme" (*id.* at 720), the Court wrote:

> "The Legislature specifically considered and expressly provided for enforcement mechanisms. As Senator Pisani's sponsoring memorandum makes clear, the provisions of title 4 were enacted as the 'comprehensive' means by which the statute accomplishes its objectives. Given this background, it would be inappropriate for us to find another enforcement mechanism beyond the statute's already 'comprehensive' scheme" (*id.*).

Two other decisions of the Court of Appeals are instructive. In *People v Ayala* (75 NY2d 422 [1990]) the trial court adopted a "more expansive reading" (*id.* at 429) of CPL 670.10, so as to permit the receipt into evidence at trial of testimony given by a witness at a prior proceeding, a suppression hearing, even though that proceeding was "not literally within any of the three categories of prior proceedings delineated in the statute"

authorizing the receipt of prior testimony (*id.* at 428). The trial court concluded that it " 'defies logic' " to believe that the Legislature intended to exclude testimony at a suppression hearing while permitting the use at trial of testimony given at a felony hearing (*id.* at 429). In holding that the admission of the suppression hearing testimony was not authorized, the Court wrote:

> "[A]lthough CPL 670.10 is largely a codification of common-law principles, this court has already rejected the argument that the statutory terms and their fair import are not exclusive. As the court has noted, the statute contains three carefully worded and enumerated exceptions to the general rule excluding hearsay evidence, suggesting that the Legislature intended the statute's reach to be relatively narrow and limited to its precise terms. Further, the general rule that in criminal matters the courts must be more circumspect counsels against a construction that would extend CPL 670.10 well beyond the fair import of its language" (*id.* at 429 [internal quotation marks, brackets and citations omitted]).

Clearly, the reasoning of *People v Ayala* applies with equal force here and further supports the conclusion that the carefully delineated circumstances set forth in CPL article 65 also are exclusive (*cf. Gade v National Solid Wastes Management Assn.*, 505 US 88, 98 [1992] [noting that field preemption, one of the two types of implied preemption, applies "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" (internal quotation marks omitted)]).

In *People v Grasso* (11 NY3d 64 [2008]), the Court stated that "[a]lthough the Executive must have flexibility in enforcing statutes, it must do so while maintaining the integrity of calculated legislative policy judgments. That balance falters where, as here, the Executive seeks to create a remedial device incompatible with the particular statute it enforces" (*id.* at 70-71). The amount of the allegedly excessive compensation was irrelevant, "however unreasonable that compensation may seem on its face" (*id.* at 72). The Attorney General's effort to recover the compensation was inconsistent with the statutory scheme and was invalid because it "would tread on the Legislature's policy-making authority" (*id.*). Similarly, it is of no moment

how unreasonable it may seem on its face to exclude live, two-way, televised testimony of an infirm and elderly witness. Whether it is reasonable is a policy judgment committed to the Legislature. In delineating in CPL article 65 the specific circumstances under which the live, two-way, televised testimony of a witness could be received into evidence, the Legislature struck a balance between the legitimate exigencies of law enforcement and the ability if not the absolute federal constitutional right of a defendant physically to confront the witnesses against him. That balance, too, may not be disturbed without "tread[ing] on the Legislature's policy-making authority" (*id.*).

The dissent offers nothing, except for subdivision (3) of CPL 65.10, in support of its conclusion that "[n]othing in CPL article 65 suggests that the Legislature . . . intended to curtail otherwise existing judicial authority to deal with other kinds of *situations not addressed by that article.*" This conclusion, however, erroneously assumes that prior to the enactment of article 65 the Judiciary had inherent authority to permit the use of televised testimony of witnesses in criminal cases. Another flaw in the dissent's position is apparent from its use of the phrase "other kinds" of situations. The dissent thus glosses over the critical point: the "situation" presented by this case differs in *substance* from the "situation" addressed by article 65. Moreover, if, as we conclude, the Judiciary's inherent powers are not so sweeping as to permit—before or after the enactment of article 65—the televised testimony of witnesses in criminal cases, the savings clause of CPL 65.10 (3) is irrelevant. That clause preserves preexisting authority "to protect the well-being of a witness *and the rights of the defendant*" (CPL 65.10 [3] [emphasis added]). Regardless of whether the use of the televised testimony in this case is consistent with the guarantees of the Confrontation Clause, it unquestionably abridged rather than "protect[ed]" defendant's "right physically to face those who testif[ied] against [her]" (*Coy v Iowa*, 487 US at 1017).

Just as the dissent does not attempt any answer to the first question posed above, it does not attempt to answer the third question, either. Presumably, however, the dissent does not believe that the Judiciary could exercise its inherent powers and approve a relatively modest expansion of the use of televised testimony in criminal cases so as to permit, for example, the receipt of televised testimony from children who are 15 years old or less. If the Judiciary could not, it can only be because that expansion would be inconsistent with the policy

choices made by the Legislature when it enacted and later amended article 65 and specified that a child witness must be 14 years old or less. But if that is so, and we believe it is, it is difficult to fathom how the far broader expansion of the use of televised testimony that was permitted in this case could be consistent with the policy choices made by the Legislature when it enacted article 65 and authorized the televised testimony of a witness only in certain sex crime cases and only then with respect to certain child witnesses. On the other hand, if the dissent believes that the Judiciary could exercise its inherent powers and permit the receipt of televised testimony from children who are 15 years old or less, it is difficult to fathom how that position can be reconciled with "[t]he constitutional principle of separation of powers . . . requir[ing] that the Legislature make the critical policy decisions" (*Bourquin v Cuomo*, 85 NY2d at 784).

The claimed authority to allow the televised testimony in this case also is inconsistent with the far more comprehensive legislative scheme of which article 65 is a part. CPL article 680, entitled, "Securing Testimony Outside the State for Use in Proceeding Within the State—Examination of Witnesses on Commission," prescribes the circumstances under which testimony material to a trial "may be taken by 'examination on a commission' outside the state and received in evidence at [the] trial" (CPL 680.10 [1]). A "commission"—i.e., "a process issued by a superior court designating one or more persons as commissioners and authorizing them to conduct a recorded examination of a witness or witnesses under oath" (CPL 680.10 [2])—is authorized when, among other requirements, the "witness resides outside the state" (CPL 680.20 [2] [d]) and "possesses information material to the action which in the interest of justice should be disclosed at the trial" (CPL 680.20 [2] [e]). The commission authorizes the commissioner or commissioners to administer the oath to the witness (CPL 680.60 [1] [c]) and, when "the examination is to occur within the United States or any territory thereof," the commissioner or commissioners must be an "attorney authorized to practice law in the specified jurisdiction or any person authorized to administer oaths therein" (CPL 680.60 [2] [a]). Although the testimony of the witness is taken "primarily on the basis of interrogatories annexed to the commission" (CPL 680.10 [2]), direct and cross-examination also is authorized "[u]pon the conclusion of the questioning . . . upon the written interrogatories" (CPL 680.70 [3]). The

"defendant has a right to be represented by counsel at the examination, and the district attorney also has a right to be present" (CPL 680.70 [3]).

The critical point here is that article 680 permits the People to take the testimony of a witness by commission only if the defendant first has applied for the issuance of a commission and that application has been granted (CPL 680.30 [1]; 680.40). Thus, the People have only a defensive or derivative right to examine on a commission a witness who resides outside the state. In essence, article 680 prohibits the People from taking the testimony of a witness outside of the state by commission except when the defendant first has been authorized by article 680 to take the testimony of a witness outside of the state that the defendant regards as relevant to his or her defense. Notably, for precisely this reason, Justice Barrett rejected an earlier application by the People to examine the witness on a commission pursuant to article 680.

Article 680 contains no exception to that prohibition for cases in which either the witness' testimony would be critical to the prosecution's case or the witness cannot travel to New York without endangering his or her life or health. At the very least, that prohibition would be undermined if the People can obtain an order from a trial court authorizing the receipt into evidence of the televised testimony of a prosecution witness who resides outside the state without regard to whether the defendant has sought a similar order relating to a defense witness.

Moreover, and in any event, as defendant expressly argued in opposing the People's motion for an order permitting the witness to testify by way of a live two-way televised procedure, "[t]he legislature has already addressed the remedies available when a witness is physically present outside New York." Because the Legislature specifically addressed that circumstance in article 680, the Judiciary lacks authority to address it and provide another remedy (cf. People v Grasso, supra). The receipt of the televised testimony in this case can be reconciled with the strictures of article 680 only by indulging the transparent fiction that despite the physical presence of the witness in California, he was not outside New York because his testimony was being transmitted by television to a courtroom in New York.[12]

---

**12.** We note, moreover, that article 680 does not authorize the testimony of the witness to be recorded by videotape. By contrast, in prescribing in CPL article 660 the circumstances under which a witness may be examined

In addition, the claimed authority to allow the televised testimony in this case is hard to square with article 660 of the Criminal Procedure Law, entitled, "Securing Testimony for Use in a Subsequent Proceeding—Examination of Witnesses Conditionally." Under article 660, either party may obtain an order directing the examination of a witness conditionally if the witness "[p]ossesses information material to the criminal action or proceeding" (CPL 660.20 [1]), and "[w]ill not be amenable or responsive to legal process or available as a witness at a time when his testimony will be sought, either because he is: "(a) About to leave the state and not return for a substantial period of time; or "(b) Physically ill or incapacitated" (CPL 660.20 [2]).[13] Although the witness may be examined in a county other than the one in which the criminal action or proceeding is pending (CPL 660.50 [2]), the examination must be conducted within the state (*People v Craig*, 151 Misc 2d 442, 444 [1992]). Of course, a criminal defendant enjoys both a statutory (CPL 260.20) and a federal constitutional right to be present at trial (*Kentucky v Stincer*, 482 US 730, 745 [1987]). As is clear from the express provision specifying that the examination "must be conducted in the same manner as would be required were the witness testifying at a trial" (CPL 660.60 [1]), the defendant has a right to be present when it is conducted (*People v Craig*, 151 Misc 2d at 444 ["The only features of a conditional examination which differ from those of a trial are the absence of a jury and the presence of duly authorized video tape recording"]).

Surely the Legislature could not have intended that the defendant's right to be present during the conditional examination of a prosecution witness could be thwarted (or the defendant's right of confrontation abridged even if not violated) whenever the prosecution does not seek a conditional examination before a witness leaves the state but applies for an order permitting the use of live, two-way, televised testimony only after the witness leaves the state. At the very least, to avoid such a nonsensical conclusion, it would be necessary to require the prosecution to establish that it did not know and could not with reasonable diligence have known that the witness was about to

conditionally—i.e., when the witness may be unavailable at the time of trial (*see* CPL 660.20 [2])—the Legislature expressly authorized the court to "order that the examination also be recorded by videotape" (CPL 660.50 [3]).

13. The examination is "conditional" because the testimony taken is admissible only if the witness is unavailable to testify at the trial or other proceeding (CPL 670.10 [1]).

leave the state.[14] Moreover, in opposing the People's application for permission to use a live, two-way, televised procedure to present the witness' testimony, defendant argued that "[w]hat the People are seeking to do . . . [is] to circumvent the established rule that a conditional examination pursuant to CPL article 660 may not be conducted outside New York." That is a substantial argument. The only conceivable response is that the provisions of article 660 are distinguishable because, although the witness' testimony was recorded on videotape, it was simultaneously presented to the jury. From the perspective of a criminal defendant who wants the protections of his "right physically to face those who testify against him" (*Coy v Iowa*, 487 US at 1017), however, it is of no moment that the testimony of an accuser is presented through live testimony rather than through testimony recorded on videotape days or weeks earlier.

■ One last issue remains to be discussed. We recognize that defendant does not press in the briefs she submitted to this Court the contention that Supreme Court lacked authority to approve the use of live, two-way, televised testimony from her principal accuser.[15] Although prudential considerations might counsel against reviewing a claim pressed by a defendant before Supreme Court but not on appeal, we are not aware of any precedent that precludes this Court from reviewing, on the law, such a preserved claim of error (*cf. People ex rel. Matthews v New York State Div. of Parole*, 95 NY2d 640, 644 n 2 [2001] [argument raised in trial court but not in Appellate Division nonetheless preserved for review]). One such consideration of course is the possibility of prejudice to the People by reversing on the basis of an issue they have not addressed in their brief to this Court. The issue of the trial court's authority to permit the receipt of the televised testimony in this case, however, presents a pure question of law and certainly merits review by the Court

---

**14.** Although defendant appears not to have disputed that the prosecution did not know that the witness had moved to California until after the move occurred, nothing in the record bears on the issue of whether the prosecution was remiss in not knowing of the move in advance.

**15.** On the other hand, defendant does not expressly abandon that contention either. Thus, in the argument section of her main brief, defendant contends that "New York State's Criminal Procedure Law explicitly permits two-way video testimony in criminal proceedings involving 'vulnerable' child witness, NY Crim Proc Law § 65.10 . . . but does not explicitly permit such testimony in any other instance." And in recounting the pretrial proceedings in her statement of facts, defendant points out that her "counsel argued that only the legislature, and not the courts, could authorize" the use of a televised presentation of the witness' testimony.

of Appeals. Regardless of whether this Court affirms or reverses the judgment of conviction, the Criminal Procedure Law expressly authorizes the Court of Appeals to review a question of law that is preserved for review in the trial court regardless of whether it was raised in the intermediate appellate court (CPL 470.35 [1], [2] [a], [b]). Thus, the People would have a full and fair opportunity to address the issue in the Court of Appeals. Moreover, reviewing and deciding this appeal on state law grounds is consistent with our obligation to avoid deciding constitutional questions whenever reasonably possible (*Matter of Clara C. v William L.*, 96 NY2d 244, 250 [2001] ["We are bound by principles of judicial restraint not to decide constitutional questions unless their disposition is necessary to the appeal" (internal quotation marks omitted)]).

Finally, if an exercise of our interest of justice powers were necessary to decide this appeal on the ground that the receipt of the televised testimony was unauthorized, we would do so. At the very least, even assuming that defendant's Sixth Amendment right of confrontation was not violated, she was denied a valuable component of that right. In our judgment, in the absence of express legislative authorization, depriving defendant of a face-to-face meeting with her principal accuser— indeed, the person whose testimony was necessary for the prosecution to make out a prima facie case—tainted the fairness of the trial.

Accordingly, the judgment of Supreme Court, Bronx County (Steven Lloyd Barrett, J., at application for televised testimony; Harold Silverman, J., at witness availability hearing, jury trial and sentencing), rendered November 23, 2004, convicting defendant of assault in the second degree, and sentencing her to a term of five years, should be reversed, on the law, and the matter remanded for a new trial.

FRIEDMAN, J. (dissenting). This case, in which defendant is charged with assaulting an 84-year-old man, presents the issue of whether a defendant's right of confrontation is satisfied by the two-way televised testimony of a necessary prosecution witness whose health would be jeopardized by travel for the purpose of appearing in court. The record supports the hearing court's case-specific finding that televised testimony was necessary to further an important public policy (*see Maryland v Craig*, 497 US 836, 850 [1990]). Accordingly, I would affirm the conviction, and therefore respectfully dissent.

At the outset, two threshold issues require discussion. First,

the record supports the hearing court's finding that it would be medically unsafe and potentially life-threatening for the victim, a man in his eighties afflicted with serious health problems and residing in a California assisted living facility, to travel to New York. The hearing court properly credited the testimony of the People's witness, an expert in geriatric medicine who actually examined the victim, over that of defendant's witness, who had no such expertise and never saw the victim. Second, the record fails to support defendant's assertion that when the victim ultimately testified at trial by two-way television, defendant's right of confrontation was undermined by the victim's inability to see the trial participants clearly. The victim stated that he could see defendant and the other persons present in the courtroom. While the elderly victim expressed some difficulty in seeing the people in the courtroom, defendant has not established that this difficulty was any greater than what the victim might have experienced had he testified in person.

Turning to the principal issue, I note that in reversing a conviction where child witnesses were kept out of the view of the defendant by means of a screen, the United States Supreme Court stated that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact" (*Coy v Iowa*, 487 US 1012, 1016 [1988]). Two years later, however, in *Maryland v Craig* (497 US 836 [1990], *supra*), the Court held that one-way televised testimony (that is, where the defendant and other trial participants see the witness, but not vice versa) could be permitted on a showing of necessity to further an important policy interest, which, in that case, was the protection of child sex-crime victims from psychological trauma. I conclude that protection of the life or health of an infirm witness is of at least equal importance to the interest recognized in *Craig*. Since the People's showing in this case met the *Craig* standard for the use of one-way televised testimony, we need not decide whether the use of two-way video equipment may be permitted on a lesser showing.

Notably, the use of live, two-way television to transmit a witness's testimony to the courtroom, where circumstances make it impossible for the witness to testify in the courtroom, has been held to satisfy the Confrontation Clause by the Second Circuit (*United States v Gigante*, 166 F3d 75 [2d Cir 1999], *cert denied* 528 US 1114 [2000] [witness was in the Witness Protection Program, and in the final stages of inoperable cancer]) and by the Supreme Court of Florida (*Harrell v State*, 709 So 2d 1364 [Fla 1998], *cert denied* 525 US 903 [1998] [the two

complaining witnesses, one of whom was in poor health, were residents of a foreign country]). *Harrell* strikingly parallels the present case. The defendant in *Harrell* was charged with robbing an Argentinian couple vacationing in Florida. Before trial, the victims returned to Argentina (beyond Florida's subpoena power), and one of them developed medical problems that made it impossible for her to travel to the United States even voluntarily. At trial, the prosecution was permitted to present the witnesses' testimony from Argentina by means of live, two-way satellite transmission (709 So 2d at 1367). The Supreme Court of Florida held that this procedure was permissible because the witnesses could not be brought physically into the courtroom (*id.* at 1369-1370) and were "absolutely essential to this case" (*id.* at 1370), and because the satellite procedure satisfied the Confrontation Clause requirements of "oath, cross-examination, and observation of the witness's demeanor" (*id.* at 1371).

I emphasize that our case is not one of those in which it would be merely inconvenient or impractical to transport a witness from a remote location; here, it was plainly dangerous to the witness's life or health. Thus, as in *Harrell*, there was simply no possibility of the witness testifying in person, and, other than televised testimony, there was no alternative to dismissal of this serious assault case (*see People v Craig*, 151 Misc 2d 442 [1992] [CPL article 660 conditional examination may not be conducted outside the state]). Accordingly, I would reject defendant's Confrontation Clause arguments.

Although defendant herself does not advocate this position on appeal, the majority strenuously argues that New York law did not authorize the court to permit the elderly and infirm victim to give televised testimony for the purpose of avoiding danger to his physical health. In particular, the majority contends that the Legislature, by expressly providing for televised testimony by child witnesses under certain circumstances in prosecutions for certain sex-related offenses (CPL art 65), implicitly divested courts of the power to permit televised testimony in situations that do not involve the prospect of "serious mental or emotional harm" to a child witness (CPL 65.10 [1]). I disagree.

The directive permitting the victim to give televised testimony under the circumstances of this case was within Supreme Court's inherent power to take steps "to aid in the exercise of its jurisdiction" and "in the administration of justice" (*Gabrelian v Gabrelian*, 108 AD2d 445, 449 [1985], *appeal dismissed* 66 NY2d 741 [1985]), as well as within its general statutory

power "to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it" (Judiciary Law § 2-b [3]). Nothing in CPL article 65 suggests that the Legislature, in affirmatively providing for the reception of televised testimony by child witnesses in sex-crime cases under specified circumstances, intended to curtail otherwise existing judicial authority to deal with other kinds of situations not addressed by that article. Moreover, the Legislature expressly disclaimed any such intention in CPL 65.10 (3), which provides in pertinent part: "Nothing herein shall be con[s]trued to preclude the court . . . from exercising any authority it otherwise may have to protect the well-being of a witness and the rights of the defendant." Given CPL 65.10 (3), the majority's fear that the court's action "trample[d] on the policy choices made by the Legislature" is unfounded, and there can be no separation of powers issue.[1]

The majority also suggests that permitting the televised testimony was somehow "inconsistent" with CPL article 680 ("Securing Testimony Outside the State for Use in Proceeding Within the State—Examination of Witnesses on Commission"). Again, I disagree. The majority overlooks that the Legislature intended to make it possible for both the prosecution and the defense to secure the attendance at a criminal trial of a witness at liberty in another state, as reflected by the enactment of the Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Proceedings (CPL art 640). In this case, of course, article 640 could not have been used by reason of the poor health of the witness, but article 680 poses no obstacle to the remedy Supreme Court devised to deal with the situation presented. True, an examination of an out-of-state witness on a commission issued pursuant to article 680 is available to the People only after an application by the defendant for such a commission has been granted (CPL 680.30 [1]). Article 680, however, was not intended to address the specific problem of an out-of-state witness who is physically unable to travel to New York, as the inability to bring the witness to the state is not a statutory prerequisite for relief under that article (*see* CPL 680.20, 680.30). Thus, article 680 was devised, not as a

---

1. The majority's reliance on *People v Herring* (135 Misc 2d 487 [1987]) is puzzling, since that case illustrates the principle that the statutory authorization of a method for giving or receiving testimony under a specified set of circumstances does not necessarily mean that the use of that method is forbidden in any case the statute does not address.

solution to the problem of an immobile out-of-state witness, but as a legislative accommodation provided to a defendant who wishes to secure the testimony of an out-of-state witness for his defense but wishes to forgo bringing the witness to New York to testify at the trial in person.[2] This explains why relief under article 680 is available to the People on a reciprocal basis only. It follows that allowing the televised testimony of the complaining witness in this case, where the witness is physically unable to travel to New York, in no way constituted an evasion of the limitation of the availability to the People of an article 680 commission.

Nor does CPL article 660 ("Securing Testimony for Use in a Subsequent Proceeding—Examination of Witnesses Conditionally") pose any obstacle to permitting the televised testimony in this case. As previously noted, a conditional examination of a witness under article 660 (which serves to preserve the witness's testimony to be received into evidence at a subsequent trial [CPL 660.10]) must be conducted within the state (see People v Craig, 151 Misc 2d 442 [1992], supra). Thus, since defendant has never contended that the People had any notice or knowledge of the complaining witness's intent to move to California before the move occurred, article 660 is simply irrelevant to the issue presented by this appeal.

I respectfully disagree with the majority's view that "authorizing the televised testimony in this case is not 'necessary to carry into effect the powers and jurisdiction' of trial courts." In my view, Supreme Court's inherent powers, and its powers under Judiciary Law § 2-b (3), are by no means limited to those absolutely indispensable to its functioning (cf. McCulloch v Maryland, 4 Wheat [17 US] 316, 413 [1819, Marshall, Ch. J.] [rejecting the argument that Congress's power under US Constitution, article I, § 8 (18) to pass laws "necessary and proper for carrying into Execution the foregoing Powers" is limited to such laws "as are indispensable, and without which the power would be nugatory"]; Allen v Crowell-Collier Publ. Co., 21 NY2d 403 [1968] [adopting a liberal interpretation of the words "material and necessary" in CPLR 3101 (a)]). In any event, and to

---

2. I note, however, that, as a commission pursuant to CPL article 680 is a discretionary remedy (see People v Carter, 37 NY2d 234, 238 [1975]), the court may consider the defendant's efforts to secure the attendance of the out-of-state witness at the trial under CPL article 640 in determining whether to issue a commission for an out-of-state examination under article 680 (see id. at 239).

reiterate, given the distant location and infirm condition of the complaining witness, this prosecution could not have gone forward at all if Supreme Court lacked power to provide for the witness's testimony from outside the courtroom. Thus, the reception of such testimony by televised means was, in fact, "necessary to carry into effect the powers and jurisdiction possessed by [Supreme Court]" in this particular case.

To recapitulate, while there is no question that courts are duty-bound to defer to the Legislature's "critical policy decisions" (*Bourquin v Cuomo*, 85 NY2d 781, 784 [1995]), neither article 65, article 660 nor article 680 of the CPL reflects any legislative policy determination, one way or the other, about the propriety of allowing televised testimony by a witness whose physical infirmities render him unable to travel to the courthouse to testify in person. In the absence of direction from the Legislature, Supreme Court retained discretion under its inherent powers and Judiciary Law § 2-b (3) to determine what steps, *if any*, could be taken to permit this prosecution to proceed notwithstanding the complaining witness's inability to be physically present in the courtroom. In my view, such discretion was properly exercised in this case.

I would also reject defendant's argument that the trial court's refusal to deliver a justification charge constituted reversible error. The court's refusal to deliver a justification charge was proper because no reasonable view of the evidence, even when that evidence is viewed in a light most favorable to defendant, supported such a charge (*see People v Cox*, 92 NY2d 1002, 1004 [1998]). Specifically, there was no reasonable view that defendant was justified in using the degree of force she admittedly used against the unarmed and aged victim, whether that degree of force is deemed to have been deadly or nondeadly (*see* Penal Law § 35.15 [1]).

Andrias, J.P., and Sweeny, J., concur with McGuire, J.; Saxe and Friedman, JJ., dissent in a separate opinion by Friedman, J.

Judgment, Supreme Court, Bronx County, rendered November 23, 2004, reversed, on the law, and the matter remanded for a new trial.